**Ellen McNAMARA, Plaintiff,**

v.

**The JOURNAL COMPANY, a Wisconsin corporation and Trustees of the Journal Company Employees' Pension Trust Agreement, Defendants.**

**No. 81–C–1386.**

United States District Court,
E.D. Wisconsin.

Feb. 21, 1984.

---

**53.** *See* Temp.Treas.Reg. §§ 5c.168(f)(8)–1–8 (1982).

Patricia K. Ballman, Quarles & Brady, Milwaukee, Wis., for plaintiff.

Dennis L. Fisher, Hoyt, Greene & Meissner, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

Currently pending before the Court are cross motions for summary judgment in this action to recover spousal death benefits under a pension plan. The plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff asserts three causes of action.[1] First, she asserts that the Trustees breached the Journal Company Employees' Pension Trust Agreement (hereinafter the "Pension Plan") when they determined that she was not entitled to the death benefit under the plan. Secondly, plaintiff alleges that defendants tortiously interferred with her contractual rights and, thirdly, that defendants breached their fiduciary duty to her by violating the Pension Plan.

## FACTUAL BACKGROUND

Plaintiff's deceased husband, Miles McNamara ("Decedent"), worked for defendant Journal Company and participated in the Pension Plan. Plaintiff was his beneficiary thereunder. In general, the Pension Plan is designed to fund retirement benefits and does not provide a pre-retirement death benefit. However, a pre-retire-

---

1. Plaintiff has waived a fourth cause of action for emotional distress.

ment death benefit is available under the limited circumstances delineated in section 7.7 of the Pension Plan.[2] Under that section, an employee may elect to provide a death benefit for the employee's spouse equal to 50 percent of the pension benefit which would have been due to the deceased employee had he retired on the day prior to death. If this election is made, and the employee does not die before retirement, his or her pension will be reduced to reflect the actuarial value of the death benefit during the time it was in full effect.

There are essentially two circumstances in which an elective death benefit is payable to a surviving spouse if death occurs prior to retirement. The first is where the employee has attained age 65 ("normal retirement") and continues working. The second, and the one at issue in this case, is for employees who are at least 59 years old with 9 years of credited service and remain actively employed. Whereas the employee who turns 65 is deemed to have elected the survivorship feature upon attaining that age unless he chooses not to be so covered, the employee who is between 59 and 65 must affirmatively elect the death benefit. For the latter class, the death benefit is not

payable until it has been in effect for one year unless the employee's death is due to accidental causes. The Pension Plan does not define the phrase "death due to accidental causes." However, the Plan does provide that the "Trustees shall have the power to construe the Plan and to determine all questions that arise hereunder ...." Pension Plan, Section 8.2(a).[3]

Although plaintiff's decedent originally declined the death benefit feature when he turned 59 on May 26, 1979, he later changed that decision and executed a pre-retirement death benefit election on November 24, 1980. Since Mr. McNamara was scheduled for surgery to repair an abdominal aortic aneurysm on December 4, 1980, the one year waiting period was discussed with him by Journal Company representatives at the time that he made the new election. Both Mildred Seibel, Secretary to the Trustees of the Pension Plan, and George Shoup, Assistant Secretary and Corporate Counsel of the Journal Company, explained to Mr. McNamara that if he died as a result of the scheduled surgery, that would not be considered "accidental" under the plan, but that if he died as a

2. Subsection (b) of section 7.7 reads:

If a Participant who has attained age 59 and completed nine Years of Credited Service so elects, in the event of his or her death before termination of Service and before attainment of normal retirement age but after qualification for early retirement (except for termination of Service), the Participant's spouse shall receive monthly payments for the remainder of such spouse's life equal to the survivor benefit described in Section 7.6, Paragraph (b), Subparagraph (i), as if the Participant's retirement occurred on the day before his or her death and the Participant had elected distribution in accordance with such joint and survivor annuity option. However, no election hereunder shall be effective until the lapse of one year after delivery thereof to the Employer or Trustees, except in the case of death due to accidental causes occurring after the date of election and after the Participant has qualified for early retirement (except for termination of Service). If the survivor annuity option provided by this Paragraph is elected, the Participant's Retirement Interest shall be reduced by .08% for each month it is in full effect.

3. Section 8.2(a) provides in full:

Subject only to Paragraph (b) of Section 8.3 and any express Employer direction provided for herein, the Trustees shall have exclusive authority and discretion to manage and control the operation and administration of the Plan and the assets of the trust, with such implied authority as may be necessary to enable them properly to carry out their duties in that respect. The Trustees shall have the power to construe the Plan and to determine all questions that arise hereunder, and from time to time formulate and issue such rulings and procedures as are deemed desirable. The decisions of the Trustees regarding any matter within the scope of their authority shall be final and binding upon all person; provided that (pursuant to reasonable claims procedures established from time to time):
(i) They shall provide adequate written notice to any Participant or beneficiary whose claim for benefits under the Plan has been denied, setting forth the specific reasons for such denial; and
(ii) They shall afford a reasonable opportunity to any such Participant or beneficiary for a full and fair review by the Trustees of the decision denying the claim.

result of malpractice during surgery, that would be accidental.

Mr. McNamara tolerated the operation on December 4, 1980, but shortly thereafter developed renal failure. He was transferred from Columbia Hospital to Milwaukee County Medical Complex on December 8, 1980, in order to undergo dialysis. During the night of December 10–11, decedent suffered a stroke and died. The discharge summary listed the cause of death as "cerebrovascular accident" and secondary conditions as "acute renal failure" and "postoperative abdominal aortic aneurysm resection." In a letter to plaintiff's attorney, the treating physician stated:

> Stroke is reported in less than 1% of lists of complications after abdominal-aortic aneurysm repair in the series which I could discover. In the absence of emboli, this death has to be considered accidental and not a direct complication of his elective surgical repair of his aneurysm.

On January 27, 1981, plaintiff's attorney telephoned Mrs. Seibel to inquire about the death benefit under the Pension Plan. Mrs. Seibel told the President of the Trustees, Thomas J. McCollow, of the inquiry. McCollow consulted that same day with outside legal counsel, George Evans, on the meaning of the phrase "death due to accidental causes" as used in the Pension Plan. Plaintiff submitted her claim for the death benefit on February 4, 1981. The claim was denied by the Trustees on February 10, 1981, for the reason that Mr. McNamara's death was not due to accidental causes within the meaning of the plan and the election had not been in force for a full year. On March 25, 1981, plaintiff requested a review of the trustees' decision. In conjunction, she submitted the operation record, the discharge summary and Dr. Owen's letter stating that the death had to be considered accidental.

In response, the Trustees sought a written legal opinion on the meaning of the phrase "death due to accidental causes." At their April 28, 1981, Board meeting, the Trustees adopted the "Ruling Construing Plan" which had been drafted by legal counsel. The Ruling construed "death due to accidental causes" to mean:

> any death directly and solely resulting from external means, as opposed to a death caused or contributed to by a disease or bodily infirmity.

This was the first time the Trustees had drafted a written explanation of the phrase. Based on this construction of "accidental death," the Trustees voted to reaffirm their denial of plaintiff's claim. She was so informed on April 29, 1981.

## STANDARD OF REVIEW

The standard of review to be applied to the decision of Trustees administering ERISA plans is well established. "A decision to deny benefits under a plan covered by ERISA will be overturned when '(1) arbitrary and capricious, (2) not supported by substantial evidence, or (3) erroneous on a question of law.'" *Wolfe v. J.C. Penney Company, Inc.*, 710 F.2d 388, 393 (7th Cir. 1983); quoting from *Peckham v. Board of Trustees*, 653 F.2d 424, 425, 426 (10th Cir. 1981). *See also Wardle v. Central States and Southwest Areas Pension Fund*, 627 F.2d 820, 824 (7th Cir.1980).

## MERITS

Plaintiff acknowledges in her brief that she would not be entitled to judgment on her second and third claims for relief unless she prevailed on her first. Thus, this discussion will focus upon why the Court is persuaded that she cannot prevail on her first claim, and why, therefore, summary judgment must be entered in favor of the defendants.

1. *Was the Trustees' Decision Supported by Substantial Evidence?*

Plaintiff appears to contend that the Trustees somehow ignored evidence concerning the cause of Mr. McNamara's death in arriving at their decision to deny her benefits under the Pension Plan. Defendants, on the other hand, contend that they did not ignore such evidence, but found it irrelevant to the task at hand—construing "death due to accidental caus-

es" within the meaning of the Pension Plan.

While it does appear that the Trustees showed some concern over whether Mr. McNamara's death was linked to his surgery when making their first decision in February of 1981, by the time they made their Review decision in April of 1981, it appears they were willing to assume that Mr. McNamara's stroke was wholly independent of the surgery. Further, there is no evidence that the Trustees disputed the medical opinion that death due to stroke was accidental.

■ Based on this review of the Trustees' decision, the Court concludes that plaintiff's argument misses the point. The evidence submitted by plaintiff related to the cause of Mr. McNamara's death and the medical opinion concerning whether such cause was accidental, but did not bear on the ultimate issue presented to the Trustees, i.e., the meaning of "accidental" for purposes of the Pension Plan.

2. *Was the Trustees' Decision Erroneous as a Matter of Law?*

The Pension Plan language at issue here is derived from statutory language contained in 26 U.S.C. § 401(a)(11)(F). This language is neither defined in that statute, nor has it been subject to judicial construction. In the absence of any federal law defining such term, plaintiff contends that the Trustees erred in not applying state law construing similar language for purposes of insurance policies.

Plaintiff relies primarily upon *Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966 (5th Cir.1981) in this regard. *Woodfork*, however, does not stand for so broad a proposition as plaintiff contends. In that case, the Court held that a worker claiming benefits to which he was entitled due to pre-ERISA employment, should be allowed to show that pre-ERISA state law would have required payment of benefits notwithstanding Pension Plan provisions to the contrary. 642 F.2d at 973.

■ Here plaintiff does not ask that pre-ERISA state pension law be used to "augment the rights created by ERISA's substantive provision." *Id.* Rather the plaintiff contends that the Trustees erred in not applying state insurance law to interpret Pension Plan language mandated by federal law. Based upon *Woodfork*, this Court can not agree with plaintiff that the Trustees failure to do so was erroneous as a matter of law.

3. *Was the Trustees' Decision Arbitrary and Capricious?*

Plaintiff's final contention is that the Trustees' April, 1981, ruling on the meaning of "death due to accidental causes" was arbitrary and capricious. Plaintiff's argument has two parts. First, plaintiff contends the Trustees' decision was defective because it was retroactive in nature. Second, plaintiff argues that the Trustees' decision ignored policies concerning the protection of Pension Plan participants and, therefore, was so unreasonable as to be arbitrary and capricious.

■ The Court finds the plaintiff's first contention to be without merit. It is undisputed that the present case was the first instance in which the Trustees were asked to construe the Plan language in light of concrete facts. With respect to prior hypothetical inquiries, including the decedent's own inquiry in November of 1980, no one connected with the Trustees ever offered a construction of the relevant phrase that was inconsistent with the formal ruling. Under these circumstances, the Court is not persuaded that the Trustees acted unreasonably in adopting a written ruling to apply to this and all future cases concerning the relevant phrase. In other words, the Trustees' decision was not an amendment "to decrease *vested* benefits of any participant." (Plaintiff's Reply Brief, p. 4, quoting from 1974 U.S.Code Cong. & Admin.News, 4639, 5038, 5067; emphasis added).

■ Finally, plaintiff contends that the Trustees' arbitrarily ignored policies suggesting that they should have construed

the ambiguous phrase in favor of claimants under the Pension Plan. Such an argument is similar in reasoning to state court decisions construing commercial insurance policies against the drafter. In *Gordon v. ILWU–PMA Benefit Funds*, 616 F.2d 433 (9th Cir.1980), it was pointed out that such a construction is given to commercial insurance contracts, because they are often standard form contracts, offered by the stronger party to the bargain, on a take-it-or-leave-it basis. 616 F.2d at 438–39. Thus, the court held that such reasoning was inapplicable to a Welfare Plan resulting from collective bargaining between the decedent's union and his employer. *Id.*

While the language at issue in the instant case is not the result of collective bargaining between parties of equal bargaining strength, it also was not adopted unilaterally by the stronger of two bargaining parties. Rather, it was mandated, as noted above, by federal statute. Thus, the Court is persuaded that the policy underlying the construction of typical contracts of adhesion should not control here.

Moreover, defendants offer evidence that Congress had an alternative policy in mind when adopting the "death due to accidental causes" language. That policy concerns a possible defect in insurance markets known as "adverse selection." According to this concept, insureds having greater knowledge of the magnitude of the insured against risk as pertains to themselves than the insurer, could skew the actuarial determinations of the insurer used to determine the premium for insuring against the risk.[4]

The problem with adverse selection may be overcome by delaying the effective date of the insurance coverage for some period, thus, equalizing somewhat the knowledge of the insureds and insurer. The concept of adverse selection would, also, not apply to events "accidental" in the sense that they were unforeseeable from the perspective of the insured.

The defendants cite legislative history, H.R.Conf.Rep. 93–1280, 93rd Cong., 2nd Sess. *reprinted in* 1974 U.S.Code Cong. & Admin.News, 4639, 5038, 5060–61, suggesting that Congress was concerned with adverse selection when adopting the language in question. Consequently, consideration of this problem by the Trustees was not unreasonable.

Plaintiff does correctly point out that in this particular case, construction of "death due to accidental death" so as to cover the decedent's unforeseeable stroke would not be inconsistent with the Trustees' concern with adverse selection. The Court, however, is not convinced that the Trustees' decision to limit that phrase to cover deaths caused by forces external to the decedent's body is unreasonable given their concern with adverse selection. Common sense suggests that death due to internal causes would more often be foreseeable to a Pension Plan participant than death due to external causes. The line drawn by the Trustees, over the long-haul, will avoid *ad hoc*, and perhaps arbitrary decisions concerning the knowledge of decedents at the time they elected the pre-retirement death benefit option.[5] Certainly the line drawn

---

4. Asymmetry of information between the insureds and insurer would necessitate a premium taking into account both high-risk and low-risk insureds, since the insurer cannot distinguish between the two groups. The premium paid by the low-risk insureds will be in excess of that necessary to cover the risk as to them, and will in part subsidize the high-risk insureds. High-risk insureds in turn may "overconsume" because of this subsidy, and eventually premiums will have to rise until the low-risk insureds are driven out of the market. *See generally,* Pauly, *Overinsurance and Public Provision of Insurance: The Roles of Moral Hazard and Adverse Selection,* 88 Q.J. Econ. 44, 54–60 (1974).

5. Note the difficult line drawing that an alternative standard might involve. In this case there was evidence that "[s]troke is reported in less than 1% of lists of complications after abdominal-aorta aneurysm repair..." Consider the case if it was reported in 5%, 10% or 25% of the cases following some treatment; where should the line be drawn?

The Court is aware that such line drawing is not unknown in the law, *e.g.,* when must a doctor inform a patient of a risk involved in treatment for purposes of "informed consent.") The question for this Court, however, is whether it was unreasonable for the Trustees to avoid the need to make such decisions.

cannot be said to be arbitrary; the Pension Plan language here was susceptable to more than one reasonable interpretation, and this Court will not substitute its judgment for that of the Trustees. *Gordon v. ILWU–PMA Benefit Fund,* 616 F.2d 433, 439 (9th Cir.1980).

It is, therefore, ORDERED, ADJUDGED and DECREED by the Court:

(1) That plaintiff's motion for summary judgment is hereby DENIED; and

(2) That defendants' motion for summary judgment is hereby GRANTED, and plaintiff's complaint dismissed.