Allan M. JONES, Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, and Fraser Shipyards, Incorporated, and Aetna Casualty & Surety Company, Respondents.

No. 91–1281.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1991.

Decided Oct. 14, 1992.

James A. Sage, Duluth, Minn. (argued), for petitioner.

Linda M. Meekins, Ann McLaughlin, Benefits Review Bd., Dept. of Labor, Washington, D.C., for Benefits Review Bd.

Eileen M. McCarthy, Appellate Litigation, Joshua T. Gillelan, II (argued), Office of the Sol., Washington, D.C., John H. Secaras, Sol. Gen., Chicago, Ill., Louis W. Rogers, Dept. of Labor, Office of Workers' Compensation Program, Washington, D.C., for Office of Workers' Compensation Program.

Larry J. Peterson (argued), Peterson & Associates, St. Paul, Minn., for Fraser Shipyards, Inc., Aetna Cas. & Sur. Co.

Before CUMMINGS and CUDAHY, Circuit Judges, and WISDOM, Senior Circuit Judge.*

CUDAHY, Circuit Judge.

This is a petition to review an order of the Benefits Review Board (the BRB or the Board) under the Longshore and Harbor Workers' Compensation Act (the LHWCA or the Act), 33 U.S.C. § 901 *et seq.* The BRB affirmed an Administrative Law Judge's (ALJ's) denial of petitioner Allan Jones' claim under the LHWCA against Fraser Shipyards, Inc. (Fraser) and Aetna Casualty & Surety Company (Aetna) for certain benefits. We grant the petition and reverse the order.

### I.

The basic facts are for the most part undisputed. On October 26, 1981, Jones sustained an injury to his lower back (involving a contusion of the sacroiliac) while in the course of his employment as a welder for Fraser at Superior, Wisconsin. Aetna, the workmen's compensation carrier, paid Jones compensation for four or five weeks of disability, and paid for his medical treatment, pursuant to the Act. Jones was laid off in April 1982 by Fraser but worked again in that employment in September 1983 and was then laid off again.

Since his injury at Fraser, Jones has continued to have lower back pain and intermittent numbness in both legs, particularly after any strenuous activity or standing or sitting for extended periods, and to receive medical and chiropractic treatment. A CT scan performed in October 1983 revealed a bulging intervertebral disc at the L5–S1 level. The treating orthopedic surgeon referred Jones to a neurosurgeon whose own CT-scan reading in November 1984 confirmed the orthopedic surgeon's and found a bulging disc at L4–5 as well. The medical-opinion evidence, with the apparent exception of one doctor's opinion, was in general agreement in relating Jones' problems involving his lumbar and lumbosacral discs to the 1981 injury.

Since leaving Fraser, Jones has worked for several employers, including Great Lakes Equipment Company (Great Lakes), for whom he went to work in January 1985. Jones worked long hours for Great Lakes, driving a delivery truck and unloading supplies weighing up to one hundred pounds at their destination. His neurosurgeon explained to Jones in 1985 that he had three "options" for management of his symptoms: continuation of chiropractic treatment; further diagnostic procedures to verify the degree of nerve-root compression (with possible surgery depending upon the findings); and avoidance of lifting more than fifty pounds "as this appears to trigger ... [your] present problems...." Jones apparently chose to pursue the first option. Aetna paid for Jones' medical and chiropractic treatment through March 1985, but declined to pay any benefit thereafter. Jones brought this suit seeking reimbursement for chiropractic and medical expenses incurred since that time.[1]

The ALJ found that

> the back condition for which the claimant has sought chiropractic and medical care since 1985 resulted in part from his 1981 injury at work and in part from a number of other causes, including overweight, poor conditioning and the exertion involved in subsequent employment and in other activities such as picking up firewood.

After setting forth his understanding of the legal standard for determining whether the subsequent work was an "intervening cause" such as to sever the causal link with the 1981 injury, the ALJ reasoned:

> The claimant's action in working as a deliveryman was neither unjustified nor misconduct. However, the testimony of

---

* The Honorable John Minor Wisdom, Senior Circuit Judge of United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. Jones quit working for Great Lakes in 1988 on the advice of physicians. After leaving the Great Lakes job, Jones' back condition improved.

Dr. Freeman [a neurosurgeon] and the claimant tends to establish that the work worsened the original injury and that the claimant was negligent in performing that work because Dr. Freeman had suggested that one option for management of the claimant's condition was for the claimant to refrain from lifting more than 50 pounds. Therefore, the claimant had reason to know that the loading and unloading of supplies weighing up to 100 pounds might cause further back problems. Moreover, the fact that the claimant sought frequent chiropractic treatment for relief of back pain in order to be able to continue with his employment at Great Lakes Equipment Company should have alerted him to the possibility that such work was unduly aggravating his back condition.

The ALJ acknowledged the medical evidence that there was "no basic underlying change in the back condition" caused by the 1981 injury, but reasoned that the work for Great Lakes brought on changes in the level of *symptoms*, requiring the treatment for which compensation is sought in the case before us. Further, the ALJ reasoned that there was "no evidence that the claimant's usual shipyard work, which he had been [medically] released to perform, was as strenuous as his subsequent work at Great Lakes." The ALJ therefore concluded that "the evidence establishes that the claimant's work activities for Great Lakes Equipment was [sic] an intervening cause and that the employer is not liable for the medical and chiropractic bills incurred by the claimant after May 1985."

The Board affirmed the decision of the ALJ, based on its conclusion that "substantial medical evidence supports the administrative law judge's finding that claimant's position at Great Lakes caused him to become symptomatic, and that it was the increased symptomatology which necessitated the medical treatment at issue in this case." The Board did not, however, examine the basis for the ALJ's conclusion that Jones' work at Great Lakes constituted an intervening cause.

## II.

With respect to questions of fact, both this court and the BRB sit in review of the ALJ's decision. *See Stevenson v. Linens of the Week*, 688 F.2d 93, 96–97 (D.C.Cir.1982); *Garvey Grain Co. v. Director, OWCP*, 639 F.2d 366, 369–70 (7th Cir.1981). The scope of the Board's review of the ALJ's factual findings is specified by statute:

[T]hose findings shall be conclusive if supported by substantial evidence in the record considered as a whole.

33 U.S.C. § 921(b)(3). Our review is also for substantial evidence. *See Symanowicz v. Army & Air Force Exch. Serv.*, 672 F.2d 638, 642 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982); *see also Freeman United Coal Mining Co. v. Anderson*, 973 F.2d 514, 517 (7th Cir. 1992) (Black Lung Benefits Act). In addition, the ALJ is required to resolve all doubts, factual as well as legal, in favor of the injured worker in order "to place the burden of possible error on those best able to bear it." *Noble Drilling Co. v. Drake*, 795 F.2d 478, 481 (5th Cir.1986). The Ninth Circuit has cogently stated the logical consequence of the established rule of doubt-resolution:

Even after the substantial evidence is produced to rebut the statutory presumption [of liability] the employer still bears the ultimate burden of persuasion. This rule does not follow from the presumption in 33 U.S.C. § 920(a), although the presumption reflects the overall policy of the Act. The rule follows from the overall humanitarian statutory policy that all doubtful questions of fact be resolved in favor of the injured employee.

*Parsons Corp. v. Director, OWCP*, 619 F.2d 38, 41 (9th Cir.1980).

We also review, as does the BRB, for errors of law. Here the ALJ determined not only that Jones' work for Great Lakes Equipment was a necessary, or "but-for," cause of his symptoms, but also that Jones was "negligent" in performing the rather strenuous duties of that employment. The ALJ went on to find that *therefore* the condition requiring Jones' chiropractic and

medical treatment after May 1985 was not employment-related within section 2(2) of the LHWCA or "required by the injury" within section 7(a). The ALJ apparently felt that the work for Great Lakes was a "supervening cause" rendering the treatment non-compensable if undertaking that work constituted negligence or some greater degree of fault.[2] We must decide whether this is an appropriate interpretation of sections 2(2) and 7(a).

■ The Director, Office of Workers' Compensation Programs, United States Department of Labor (the Director), has filed a brief in this court as a respondent in this proceeding and has indicated his administrative construction of section 2(2). The administration of the LHWCA is, of course, committed by Congress to the Secretary of Labor and by him to the Director. The Director's views on the appropriate construction of terms of the LHWCA are therefore entitled to appropriate deference. *See Newport News Shipbuilding and Dry Dock Co. v. Howard,* 904 F.2d 206, 208 (4th Cir.1990); *Lukman v. Director, OWCP,* 896 F.2d 1248, 1250–51 (10th Cir.1990); *see also Mullins Coal Co. v. Director, OWCP,* 484 U.S. 135, 159, 108 S.Ct. 427, 440, 98 L.Ed.2d 450 (1987) (interpreting cognate Black Lung Benefits Act); *Director, OWCP v. Midland Coal Co.,* 855 F.2d 509, 512 (7th Cir.1988) (same). On the other hand, adjudication of disputed cases is vested in independent administrative tribunals—the ALJs and the Board. The BRB's views on the appropriate construction of terms of the LHWCA, however, are not entitled to special deference because the Board does not "administer" the LHWCA. *Potomac Electric Power Co. v. Director, OWCP,* 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980).

■ We must defer to the Director's construction of the LHWCA and articulations of administrative policy unless they are unreasonable or contrary to the purposes of the statute or to clearly expressed legislative intent on the point in issue. *See Chevron U.S.A., Inc. v. NRDC,* 467 U.S.

837, 842–45 and n. 9, 11, 104 S.Ct. 2778, 2781–83 and n. 9, 11, 81 L.Ed.2d 694 (1984). As the Fourth Circuit observed in *Newport News Shipbuilding:*

> *Chevron* warns against our undertaking a balance of competing policy goals by way of coming up with our own interpretation. Our function is simply to determine whether the balance struck by the Director embodies a reasonable interpretation of statutory provisions whose intended meaning is by no means plain. Lacking plain guidance from Congress, we cannot say as a matter of law that the Director's interpretation ... is unreasonable. Accordingly, we adopt the Director's interpretation....

904 F.2d at 210–11. Hence, with respect to the legal standards to be applied in this case, the views of the Director must be given substantial weight.

### III.

■ The LHWCA provides for the payment of compensation to maritime employees, including longshoremen and harbor workers, who are disabled as the result of an injury occurring "upon the navigable waters of the United States." 33 U.S.C. § 903(a). "Navigable waters" includes dry dock or any "other adjoining area customarily used" to repair, dismantle or build vessels. *Id.* Section 2(2) of the statute defines "injury" as follows:

> the term "injury" means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury....

33 U.S.C. § 902(2). The ALJ in the case before us held that Jones' post-May 1985 symptoms and consequent treatments were not the "natural[ ] or unavoidabl[e] result[ ]" of his 1981 accident because his "negligence" in ignoring a doctor's warning to avoid lifting more than fifty pounds had broken the chain of causation from the 1981 accident to the post-May 1985 symp-

---

**2.** It is not clear that the BRB would also require a finding of negligence to sever the causal con-

nection between the 1981 injury and the post-May 1985 treatments.

toms. At the same time, the ALJ found Jones' conduct was not "unjustified," nor did it amount to "misconduct." Based on his finding of "negligence," however, the ALJ denied compensation for the post-May 1985 treatments. The Director argues that we should reverse this denial because (1) the record does not support the ALJ's finding of "negligence," (2) even if Jones was "negligent," that negligence was foreseeable and therefore not a "supervening cause," (3) Jones' post-May 1985 symptoms were not the result of a second, separate "injury" that severed the causal connection between those symptoms and his 1981 fall and (4) even if there was a second "injury," Jones' work for Great Lakes could not be a supervening cause because it did not constitute "affirmative misconduct."

In connection with his discussion of negligence, the Director first contends that the doctor who proposed the fifty-pound limit did so only as an "option" and not as a prohibition against such lifting. Therefore, there were no facts upon which to found a violation of the standard of reasonable care for Jones' own safety. Second, the Director argues that an injured party's negligence can constitute a "supervening" cause such as to relieve the employer from liability from consequential injuries only if such negligence was not foreseeable. *See Restatement (Second) of Torts* §§ 447(b), (c), 460 (1965); *cf. id.* §§ 435(2), 446.[3] He contends that in this case the "negligence" was foreseeable because it could be foreseen that Jones' work experience would primarily qualify him for jobs involving strenuous physical activity posing a threat of exacerbation of his back injury.

Both of these factors relate to policy in the administration of the LHWCA with respect to which we believe deference to the Director is indicated. It would make little sense to administer this remedial statute intended for the benefit of waterfront employees in a way that would unreasonably circumscribe their pursuit of employment. Further, we have no reason to believe that Jones could maintain his income in work other than that making significant physical demands and possibly threatening to exacerbate his lower back condition. Without condoning reckless disregard by an employee of his physical limitations and disabilities, we think it not unreasonable to place on an earlier employer the burden of subsequent and easily foreseeable employment. Here the ALJ expressly found that Jones' pursuit of his employment with Great Lakes was neither unjustified nor misconduct.

█ We are aware that a number of authorities have stated that a subsequent act of negligence on the part of the injured employee can be an intervening cause relieving the original employer of liability. *See Cyr v. Crescent Wharf & Warehouse Co.,* 211 F.2d 454, 447 (9th Cir.1954) ("By the use of the word 'unavoidable' the statute placed upon the injured employee the duty of using due care in regard to his injury and limited the exclusion of negligence to the happening on the job which caused the primary injury."); *see also* 1 Arthur Larson, *Workmen's Compensation* § .13.12 (1991 abridged). But we believe that such an approach is problematic both as a matter of policy and because it is not supported by the language of the statute. The statutory language reads: "naturally or unavoidably results from such accidental injury...." The word "unavoidably" is used in the disjunctive with the word "naturally." A "natural" result seems almost the same as a "foreseeable" one and is not inconsistent with some degree of negligence. Here, although the ALJ found "negligence," he also found that Jones was "not unjustified" in taking the job with Great Lakes. This certainly is a desiccated form of "negligence" and may even involve application of the wrong legal standard. As a matter of policy, the issue is how

---

3. Although section 447 is phrased in terms of an intervening act of a "third person," the commentary makes clear that it "applies to acts done either by the person who is harmed or by a third person." Restatement (Second) of Torts § 447 comment h. Thus, where the intervening negligent act is done by the person who is harmed, that act "does not prevent the [first] actor's negligence from being a legal cause of his harm...." Although the act of the person harmed in such a case does "constitute[ ] contributory fault," *id.,* that is a different issue.

narrowly to restrict the subsequent work of an injured employee—an important and difficult question. We believe that "foreseeable" or "natural" circumstances—even involving a degree of negligence—should not automatically disentitle the claimant.

Going beyond the issue of negligence, the Director argues that this is not properly viewed as a "two-injury" case at all. Rather, because there was only one specific, traumatic event here—Jones' fall at Fraser Shipyards—considerations of "intervening cause" are not even relevant. Therefore, we should apply the "but for" causation test that we adopted for Black Lung Benefit Act claims in *Shelton v. Director, OWCP*, 899 F.2d 690 (7th Cir.1990).[4] The Director argues that, according to that standard, Jones' 1981 fall at Fraser Shipyards was the "cause" of his post-May 1985 symptoms.

This argument has considerable logical appeal, although the assumption that principles of intervening cause do not apply unless the subsequent injury or aggravation results from a specific, traumatic event may be inconsistent with the rules traditionally applied in workers' compensation cases. In particular, workers' compensation law has long recognized that unreasonable failure or refusal to seek appropriate medical treatment for an injury may constitute an intervening cause, so that aggravation of the injury attributable to that failure to refusal may be noncompensable. Larson, *Workmen's Compensation* § 13.22, at 3–183 to 3–189 (collecting cases). Like Jones' work for Great Lakes, the failure or refusal to go along with appropriate medical treatment is a continuing course of conduct, rather than a "traumatic event" such as the Director would require. Of course, the sort of continuing conduct involved in ignoring medical treatment is presumably intentional, or at least reckless, rather than merely negligent, and

is therefore easier to conceive as an intervening cause. In this respect, the finding of the ALJ here that Jones' conduct was "not unjustified" may be significant. In addition, the single specific traumatic event approach may make it easier to assign liability among a series of workmen's compensation carriers, only one of which provided coverage at a time when a specific traumatic event occurred.

▌ Finally, the Director contends that, even assuming this to be a "consequential injury" or "two injury" case, Fraser Shipyards is still liable because only affirmative misconduct can be a "supervening cause" so as to sever the causal connection between the 1981 injury and the post-May 1985 symptoms requiring treatment. This analysis requires consideration of the "naturally or unavoidably result[ing]" provision of section 2(2). It may also involve the "arising out of and in the course of employment" test of that subsection. In construing these provisions, we are, of course, guided by *Chevron* and its progeny. *See Lukman*, 896 F.2d at 1250–51 (applying *Chevron* analysis to the Director's interpretation of the LHWCA as applied to a claim for Black Lung Benefits). First, we must ask whether Congress has directly addressed the precise issue in dispute. *See Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. If congressional intent is clear, that presumably ends the inquiry. *Id.* at 842–43, 104 S.Ct. at 2781–82. On the other hand, if Congress has not addressed the precise question at issue the court must then ask whether the Director's interpretation is reasonable. *Id.* at 843, 104 S.Ct. at 2782. The court is not to substitute its own construction of a statutory provision for a reasonable one made by an agency. *Id.; see also Newport News Shipbuilding*, 904 F.2d at 210–11 (adopting Board's interpretation of LHWCA provision limiting em-

---

**4.** In *Shelton*, we held that coal-mine dust exposure need only be a "contributing cause" of a respiratory disability in order for the disability to be compensable under the Black Lung Benefits Act. We found that even though the disability might have been avoided "by care on some other front, for example by not smoking," the disability was "due to" coal-mine work, as re-

quired by the Black Lung Benefits Act, so long as the work was a "contributing"—that is, a necessary even if not a sufficient—cause. 899 F.2d at 693. In so holding, we pointed out that this but-for test "corresponds to the standard of causation used in most other areas of the law." *Id.*

ployers to 104 weeks of liability when injury aggravates an extant disability because the court "cannot say as a matter of law" that the Director's interpretation is "unreasonable").

A reading of the statute persuades us that Congress has not directly addressed the precise issue in dispute here. Hence, our task is to determine whether the Director's view that only affirmative misconduct may constitute a supervening cause so as to interrupt the causal connection between the original injury in 1981 and any subsequent injuries after 1985 is reasonable. Certainly it is an interpretation consistent with the principle that the LHWCA is to be liberally construed in favor of injured employees. *See New Orleans (Gulfwide) Stevedores v. Turner,* 661 F.2d 1031, 1038 (5th Cir.1981); *see also Voris v. Eikel,* 346 U.S. 328, 333, 74 S.Ct. 88, 91, 98 L.Ed. 5 (1953). In addition, the Director cites a body of case law from the Fifth Circuit in support of this standard. We examine these decisions in some detail.

In *Mississippi Coast Marine, Inc. v. Bosarge,* 637 F.2d 994 (5th Cir.1981), *modified and rehearing denied,* 657 F.2d 665 (1981), the Fifth Circuit held that "a subsequent injury is compensable if it is the direct and natural result of a compensable primary injury, as long as the subsequent progression of the condition is not shown to have been worsened by an independent cause." 637 F.2d at 1000. *Bosarge* was cited by the ALJ here as authority for denying the claim. In the later case of *Atlantic Marine, Inc. v. Bruce,* 661 F.2d 898 (5th Cir. 1981), however, the court rejected the employer's argument that *Bosarge* precluded an employee with pre-existing arteriosclerosis from being compensated for a heart attack he suffered as a result of the severe emotional distress caused by an on-the-job back injury sustained a few years earlier. The court noted that there was "no evidence that [the employee's] back injury or the attendant stress was the exclusive cause of his heart attack. [The employee] was suffering from arteriosclerosis and according to the evidence it is only because of this underlying condition that his stress precipitated his heart attack." *Id.* at 901. The court further noted that there was a "superficial semantic logic" to the employ-

er's argument. Nonetheless, the court found that *Bosarge* was inapplicable to the facts of the case and that the arteriosclerosis was not a supervening cause: "We continue to apply the Act's liberal concept of causation to subsequent injuries as well as to initial ones." *Id.* In addition, the court noted some tension between the standard enunciated in *Bosarge* and that which the Fifth Circuit had established several years earlier in *Voris v. Texas Employers Ins. Ass'n,* 190 F.2d 929 (5th Cir.1951), *cert. denied,* 342 U.S. 932, 72 S.Ct. 376, 96 L.Ed. 694 (1952): "Whereas *Bosarge* appears to require only a simple worsening to give rise to a supervening cause, in [*Voris*], we looked for 'overpowering' and 'nullifying' effects." 661 F.2d at 901 n. 5.

The Fifth Circuit summarized these developments in *Bludworth Shipyard, Inc. v. Lira,* 700 F.2d 1046 (5th Cir.1983), stating:

the case law of this circuit demonstrates that, in an LHWCA case, an intervening cause may sever the causal connection between an original work-related injury and subsequent consequences a worker may suffer. The employee's own deliberate conduct may constitute such an intervening cause. If the remote consequences are the direct result of the employee's unexcused, intentional misconduct, and are only the indirect, unforeseeable result of the work-related injury, the employee may not recover under the LHWCA.

700 F.2d at 1051. The court further observed that, in the case before it,

[the employee's] intentional failure to inform his treating physicians that he was a prior addict constituted a supervening independent cause that worsened his condition. His omission *overpowered and nullified* the causal connection between his prior back injury and his subsequent readdiction to heroin.

*Id.* (emphasis added). Finally, and quite significantly, the *Lira* court said: "We do not decide whether the same result would obtain if Lira *unintentionally* failed to inform the hospital of his prior condition." *Id.* (emphasis added).

Thus, although these Fifth Circuit cases appear to support a more demanding standard than the "negligence" relied on by the ALJ and the Board, they do not clearly

support a requirement for *affirmative misconduct* as the sole species of "supervening cause." Even *Lira*, which provides the strongest case for an affirmative misconduct requirement, expressly reserved the issue of unintentional conduct. *Id.* at 1053; *see also* 1 Larson, *supra*, § 13.11 (noting that negligence may be a supervening cause in some circumstances). It is therefore not entirely clear that an affirmative misconduct requirement would, in light of the authorities, be reasonable; like the Fifth Circuit, however, we need not decide that precise question here. It is clear that the Director, in the interests of liberal construction of the statute in favor of injured employees, proposes a considerably more exacting standard for an intervening cause than the one applied by the ALJ and the Board here. As noted earlier, the standard applied by the Board and the ALJ in this case would make it difficult for injured workers to seek employment for which they were qualified. In that view, the Director is supported by the Fifth Circuit cases and by other authority. *See Lira*, 700 F.2d at 1050 (proximate cause analysis is much narrower under LHWCA than in typical tort case).

We believe that the Fifth Circuit cases essentially provide that, under the LHWCA, "[t]here must ... be some connection between the [injury] and the employment, and the causal effect attributable to the employment must not have been *overpowered and nullified* by influences originating entirely outside the employment." 190 F.2d at 934 (emphasis added). Under this test there might be some doubt whether simple negligence could qualify as a supervening cause. But we leave that question to another day. It is clear to us that Jones' subsequent conduct in the instant case did not "overpower and nullify" the causal effect emanating from the 1981 injury. The 1981 injury was undoubtedly a "contributing" ("but for") cause of the post-May 1985 symptoms and treatments; indeed, it was the only specific traumatic event in the case. In addition, Jones' later "negligence" was easily foreseeable in 1981 and for that reason could not in general serve as a supervening cause. Although we do not think that a worker's reckless disregard of his own health and safety would ordinarily be foreseeable, we think that it *is* generally foreseeable that workers will seek employment for which they are most qualified even if there might be some risk of aggravating an injury.

As noted above, Fraser and Aetna rely on the word "unavoidably" in section 2(2) of the LHWCA to argue that "avoidable" negligence would break the causal chain and exculpate the employer. But section 2(2)'s definition of "injury" uses "unavoidable" in the disjunctive with "naturally." We think it clear that Jones' aggravation of his symptoms in the employ of Great Lakes is a "natural" result, even if not an "unavoidable" one, of the 1981 accident.

We agree with the Director's position. Since the post-May 1985 symptoms and the measures taken to treat them were causally connected to the 1981 injury and since that causal relation was not overpowered and nullified by subsequent acts on the part of Jones, the petition for review is hereby GRANTED and the Board's order REVERSED and REMANDED for calculation of the appropriate benefits.